UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | | |
|---|---|---|
| Estate of BECKY LYNN EVANS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 4:14-cv-00067-SEB-TAB |
| | ) | |
| CITY OF JEFFERSONVILLE, | ) | |
| JEFFERSONVILLE POLICE | ) | |
| DEPARTMENT, | ) | |
| J. SCHILLER Officer, Individually, | ) | |
| KENTON MAKOWSKY Officer, | ) | |
| Individually, | ) | |
| CHRIS GRIMM Jeffersonville Police | ) | |
| Department Chief of Police, Individually, | ) | |
| WILSON Officer, Individually, | ) | |
| JOHN DOE Unknown Officer of | ) | |
| Jeffersonville Police Department, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

This cause is before the Court on Defendants' Motion for Summary Judgment [Docket No. 10], filed on March 16, 2015. Plaintiff Estate of Becky Lynn Evans brings this action against Defendants City of Jeffersonville, Jeffersonville Police Department,[1] Chris Grimm in both his individual capacity and official capacity as Chief of Police of the Jeffersonville Police Department, and J. Schiller, Kenton Makowsky, Todd Wilson,

---

[1] Plaintiff now concedes that the Jeffersonville Police Department is entitled to summary judgment on all claims. Accordingly, we GRANT Defendants' Motion for Summary Judgment as to Defendant Jeffersonville Police Department.

1

and John Doe, all in their individual capacities, pursuant to 42 U.S.C. § 1983, alleging that Defendants violated Becky Evans's rights under the Fourteenth Amendment to the United States Constitution.  Plaintiff also brings a state law wrongful death claim against Defendants.  For the reasons detailed below, we <u>GRANT</u> Defendants' Motion for Summary Judgment.

## **Factual Background**

**The Events of June 10, 2012**

This case arises from events that occurred on June 10, 2012 in Clark County, Indiana.  On that date, the Clark County Dispatch Center received a 911 call from Stephanie Albi who reported that she lived at 2920 Teakwood Landing and was hearing an "abnormal noise" coming from the adjacent patio home.[2]  Exh. 5 (Audio Recording of 911 Call).  Ms. Albi requested police assistance, stating that she did not know if it was a medical emergency or a domestic issue.  She further described the sound as an "abnormal moaning" that was "not snoring."  *Id.*  Ms. Albi told the 911 operator that she did not want to knock on the door in case it was a domestic dispute.  Ms. Albi stated that her neighbors' first names were Elliot and Becky, but that she did not know their last names or telephone number.  *Id.*

---

[2] Ms. Albi and the Evanses own adjacent contiguous patio homes.  Because of the manner in which the houses are positioned, Ms. Albi's master bedroom shares a wall with the Evanses' master bedroom.  Exh. 5.

At approximately 4:30 a.m., the 911 operator dispatched Defendant Kenton Makowsky, a police officer with the Jeffersonville Police Department ("JPD"), to the Evanses' residence,[3] advising Officer Makowsky that the neighbor had been hearing a moaning sound coming from 2922 Teakwood Landing for approximately two hours and thought it might be a medical emergency. Exh. 5. Officer Makowsky had been employed as a JPD patrolman since February 17, 2007. As a patrolman, Officer Makowsky's duties included patrolling the city, responding to general calls for service, and checking on any suspicious activity. Makowsky Dep. at 9, 23-25. Prior to being dispatched to Teakwood Landing on June 10, 2012, Officer Makowsky had never before responded to a call at that location. *Id.* at 20-21.

When Officer Makowsky arrived at 2920 Teakwood Landing, he knocked on Ms. Albi's door. Ms. Albi reported that she was still hearing a sound next door and Officer Makowsky asked if he could come in to try to hear the sound himself. He put his ear up to her wall and could hear a faint moaning noise. Ms. Albi stated that she had heard the moaning for approximately one-and-a-half to two hours. Officer Makowsky testified that the sound he heard was a faint, quick moaning sound that was rhythmic, consistent in nature, and very shallow, with a steady pitch. He believed the noise could be coming from any number of possible sources, including the television or an individual or individuals engaged in sexual activity, but he could not determine the source with certainty. *Id.* at 20-24.

---

[3] Officer Makowsky's shift began at 10:00 p.m. on June 9, 2012. Makowsky Dep. at 19.

Approximately three to four minutes after Officer Makoswsky arrived at Teakwood Landing, Defendant J. Schiller, also an officer with the JPD, arrived on the scene.  At the time he responded to the call at Teakwood Landing, Officer Schiller had been with the JPD for six years and, prior to responding to the June 10, 2012 call, Officer Schiller had never before heard of Stephanie Albi, Becky Evans or Elliot Evans nor had he responded to a call at that location.  Schiller Dep. at 4, 19.  Before arriving on the scene, Officer Schiller had been informed that the complainant had reported hearing some sort of noise coming through the adjoining wall between her home and her neighbors' home.  *Id.* at 15-16.

Upon Officer Schiller's arrival on the scene, Officer Makowsky told Schiller that he had heard a faint noise coming from the Evanses' residence, but that he could not make out what was causing the sound.  Officer Makowsky asked Officer Schiller to come inside Ms. Albi's house to listen.  Makowsky Dep. at 25.  Officer Schiller then asked Ms. Albi to tell him what she was hearing and how long she had been hearing the noise.  Ms. Albi reported that she had been hearing strange noises emanating from the adjoining residence for approximately two hours, that she did not know the source of the noise, and that she was concerned.  Schiller Dep. at 17.

When Officer Schiller put his ear to the wall he heard "a very, very faint noise." *Id.* at 18.  Officer Schiller asked Ms. Albi if he could borrow a drinking glass in an attempt to amplify the sound, which technique slightly amplified the sound, but Schiller testified that he still could not definitively identify its source.  *Id.*  Officer Schiller

4

described the noise as a "very faint moaning of almost – like if someone is having a nightmare while they're sleeping – if you've ever heard like a female or maybe a child or maybe when they're sick and they're sleeping and they don't feel well, or it almost sounded like a – almost like a sexual-type moan." *Id.*  Officer Schiller testified that he speculated that it could have been a noise coming from the pipes in the wall or a television or fan in the Evanses' residence.  *Id.* at 19.  Officer Makowsky also listened to the noise with the aid of the drinking glass to amplify the sound and testified that after listening to the sound a second time, he became concerned about what was occurring in the Evanses' residence.  Makowsky Dep. at 27.

At that point, the officers departed Ms. Albi's home and approached the front door of the Evanses' residence.  The residence was dark and there were no lights on either inside or outside the house.  Schiller Dep. at 20.  The officers rang the doorbell, knocked on the door, knocked on the windows adjacent to the door, and announced "Jeffersonville Police Department" several times with no response.  According to Officer Makowsky, he knocked on the door numerous times with his fist and announced his presence at a level that was just shy of screaming.  Makowsky Dep. at 27-28.  Officer Schiller testified that based on the fact that no one responded, it did not appear that anyone was home.  Schiller Dep. at 21.

While Officer Makowsky remained at the front door, Officer Schiller went around to the back door to see if he could observe anything that could help determine whether anyone was inside the residence.  While still at the front door, Officer Makowsky was

able to look through a window on the door and observe a good portion of the living room and kitchen area.  He saw furniture and signs that someone lived in the home, but did not observe anyone in that area of the residence.  He was unable to look through the window next to the door because the blinds were drawn.  *Id.* at 39, 31.  Officer Makowsky testified that he was not able to detect the moaning sound from his position at the front door.  *Id.* at 39.

At the back of the Evanses' residence, Officer Schiller saw a window near the adjoining wall of the two patio homes which he believed to be one of the bedroom windows.  There was a dim light on in the room, but all the shades were drawn, so Officer Schiller could not see inside the room.  Schiller Dep. at 21.  Officer Schiller also saw a sliding glass door with vertical blinds through which he could partially see into the kitchen.  Although the lights were off, he was able to observe a dog bowl in the kitchen as well as a leash outside near the patio, indicating that a canine lived at the residence.  *Id.* at 22.  While he was behind the home, Officer Schiller knocked on the patio door and the bedroom window, announcing himself as a police officer.  Both the door and the windows were locked and no one answered when he knocked and announced himself.  *Id.* at 23.  Officer Schiller testified that he could not hear the moaning noise from outside the Evanses' residence.  *Id.*

Officer Schiller then telephoned dispatch to determine whether there was a call history at the Evanses' residence in the hopes that the JPD might have a contact number

on file for the occupants of the home, but there was no call history.[4]  *Id.* at 24.  Officer Schiller next checked the mailbox and found a few days' worth of mail addressed to Becky and Elliot Evans.  *Id.* at 25.  With that information, the officers' dispatcher was able to retrieve basic information from the Bureau of Motor Vehicles about the individuals the officers believed resided in the home.  Officer Makowsky also searched Facebook for Elliot Evans, but Mr. Evans's profile was set to private so Officer Makowsky was unable to obtain information regarding the account.  Makowsky Dep. at 34.

Officer Schiller returned to Ms. Albi's residence while Officer Makowsky again knocked on the front door and rang the doorbell in an attempt to determine whether that would cause any change in the consistency or tone of the noise they were hearing or if there was any other indicator of someone in distress, such as a call for help, that would indicate that the source of the sound was an actual person as opposed to some unidentified ambient noise.  Officer Schiller reported that he detected no change in the pitch, tone, or consistency of the sound when Officer Makowsky knocked on the door and rang the doorbell.  Schiller Dep. at 27-28.  Based on this information, Officer Makowsky testified that he believed that the source of the noise was a television or radio, or some other similar device.  Makowsky Dep. at 36-37.

---

[4] The exact time is not clear from the record, but at some point while the officers were at Teakwood Landing, the 911 dispatcher offered to dispatch medical assistance, if necessary.  The JPD officers declined this offer.

Officer Schiller contacted his shift supervisor, Chris Ueding, both to inform him of the circumstances and to seek guidance regarding entering the Evanses' residence. Officer Ueding asked Officer Schiller if he believed there was a basis for a forced entry into the home and Officer Schiller stated that he did not believe so.  Schiller Dep. at 41-42.  If Officer Ueding advised Officer Schiller to proceed in any particular manner following this exchange, that information is not in the record before us.

Defendant Corporal Todd Wilson of the JPD then arrived on the scene.  At the time the events underlying this litigation occurred, Corporal Wilson had been with the JPD for over sixteen years.  Corporal Wilson had not immediately responded to the Teakwood Landing call because he had been working an accident investigation at a different location.  He arrived at Teakwood Landing approximately one hour and four minutes into the call.  Before arriving at the scene, he was informed that Officers Makowsky and Schiller had knocked on doors, checked windows, and had seen a light in the house.  He also recalled a mention on the dispatch radio of there being a dog at the residence.  Wilson Dep. at 16-18.

When Corporal Wilson arrived on the scene, Officers Makowsky and Schiller briefed him on the situation, advising him that they had heard some type of moaning noise inside the residence but that they could not determine whether the source was an actual person, some sort of electronic device, or other some other source entirely.  The officers reported that they had attempted to make contact and inspected all doors and windows, which were secure.  The lighting in the home was consistent with the occupants

8

of the residence either being away from the home or asleep.  The officers further reported that although they had found a dog leash, when they knocked on the door and rang the doorbell, there was no barking sound.  They also told Corporal Wilson that they had checked the mailbox and the mail had been accumulating for a few days.  Based on these facts, Officer Makowsky stated that he did not believe that anyone was home.  *Id.* at 45-46.  Corporal Wilson was also told that the officers had checked the call history of the residence and there had been no prior police interaction or medical runs to the home. Wilson Dep. at 18.

Corporal Wilson then asked Officer Schiller if he believed there was sufficient cause to force entry into the residence and Schiller responded that he did not believe so. Schiller Dep. at 31.  Officer Schiller cited the fact that he could not determine with certainty the source of the moaning noise as well as his belief – based on his investigation of the scene – that the Evanses were not home.  *Id.*  The officers told Corporal Wilson "we don't think it is any type of medical emergency and we are going to clear it." Wilson Dep. at 19.  Following this conversation, Corporal Wilson left the scene without leaving his vehicle or speaking with Ms. Albi.  *Id.*

Before Officers Makowsky and Schiller departed the scene, Officer Makowsky again spoke with Ms. Albi to inform her that the officers did not believe they could lawfully enter the residence based on the facts then in their possession.  He instructed Ms. Albi to contact the police again if the noise changed.  The officers left Teakwood

Landing between 5:30 and 5:45 a.m. without having determined the source of the moaning noise.  *Id.* at 48-49.

As the first officer on the scene, Officer Makowsky was responsible per JPD policy for preparing an incident report.  His report stated as follows:

> Upon arrival, contact was made with the caller, Stephanie L. Albi, who stated for approximately two hours she could hear a moaning sound coming from the attached residence at 2922 Teakwood Landing Dr.  During the investigation, Officers could hear the noise and immediately attempted contact to no avail.  It should be noted that there were no indicators of the noises being distressing in nature.  Mail in the mailbox to the residence owners, identified as Elliot and Becky Evans, was shown to be postmarked 06/07/12.  A canine leash was located near the rear door yet while attempting contact, no canine could be heard inside.

Exh. 2 to Makowsky Dep.

In the late afternoon hours of June 10, 2012, Becky Evans was found dead in the master bedroom of the residence located at 2922 Teakwood Landing Drive.  There is no evidence in the record regarding the official cause or time of her death.

**Defendants' Policies and Procedures**

It is undisputed that the JPD's Standard Operating Procedures ("SOPs") do not provide specific instructions regarding the performance of welfare checks like the one performed by Officers Makowsky and Schiller (and Corporal Wilson) at Teakwood Landing.  However, Section 7 of Article III of Title I of JPD's "SOPs" states:

> The Department assists in routine and emergency situations, often because there are no other public or private agencies available.  The public relies upon the Department for assistance and advice in the many routine and emergency situations which develop in an urban society.  For this reason

and because there is frequently a potential for crime, the Department regularly responds to incidents where it is not contemplated that an arrest will be made.

Saving lives and aiding the injured, locating lost persons, keeping the peace and providing for many other miscellaneous needs are basic services provided by the Department.  To satisfy these requests, the Department responds to calls for service and renders such aid or advice as is necessitated or indicated by the situation.

Exh. 6.  Section 5 of Article V of Title I of the SOPs provides:

An officer who lawfully acts within the scope of his/her authority does not deprive persons of their civil liberties.  He/she may within the scope of his/her authority make reasonable inquiries, conduct investigations, and arrest on probable cause.  However, when an officer exceeds his/her authority by unreasonable conduct, he/she violates the sanctity of the law which he/she is sworn to uphold.

*Id.*

**The Instant Litigation**

On June 6, 2014, Plaintiff filed its complaint in Clark Circuit Court alleging a state law wrongful death claim (Count I); and three claims brought pursuant to § 1983 – the first against the individual Defendants who allegedly violated Becky Evans's substantive due process rights as protected by the Fourteenth Amendment (Count II) and another against the City for a failure to train (Count III) and a third against Defendant Grimm in his official capacity for failure to implement appropriate polices, customs, and practices (Count IV).  The case was removed to this court on July 9, 2014.  Defendants filed their motion for summary judgment on March 16, 2015, which was fully briefed as of June 19, 2015.

## **Legal Analysis**

### I.    **Standard of Review**

Summary judgment is appropriate when the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party.  See *id.* at 255. However, neither the mere existence of some alleged factual dispute between the parties, *id.* at 247, nor the existence of some metaphysical doubt as to the material facts, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), will defeat a motion for summary judgment.  *Michas v. Health Cost Controls of Illinois, Inc.*, 209 F.3d 687, 692 (7th Cir. 2000).

The moving party bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323. The party seeking summary judgment on a claim on which the non-moving party bears the burden of proof at trial may discharge its burden by showing an absence of evidence to support the non-moving party's case.  *Id.* at 325.

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes. *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Thus, after drawing all reasonable inferences from the facts in favor of the non-movant, if genuine doubts remain and a reasonable fact finder could find for the party opposing the motion, summary judgment is inappropriate. *See Shields Enter., Inc. v. First Chicago Corp.*, 975 F.2d 1290, 1294 (7th Cir. 1992); *Wolf v. City of Fitchburg*, 870 F.2d 1327, 1330 (7th Cir. 1989). But if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish her case, summary judgment is not only appropriate, but mandated. *See Celotex*, 477 U.S. at 322; *Ziliak v. AstraZeneca LP*, 324 F.3d 518, 520 (7th Cir. 2003). Further, a failure to prove one essential element necessarily renders all other facts immaterial. *Celotex*, 477 U.S. at 323.

## II.     Section 1983 Claims

The Plaintiff's Complaint asserts the § 1983 claims against Officer Schiller, Officer Makowsky, Corporal Wilson, and JPD Police Chief Chris Grimm, in their individual capacities, for failing to adequately respond to and carry out a welfare check in violation of Becky Evans's substantive due process rights under the Fourteenth Amendment to the United States Constitution. Initially, we note that there are no allegations in Plaintiff's Complaint that Chief Grimm in any way participated in the welfare check, was consulted regarding the welfare check, or had any direct involvement with the welfare check at issue in this litigation. To hold an individual liable under § 1983, a plaintiff must establish that the person "caused or participated in [the] alleged

13

constitutional deprivation." *Kuhn v. Goodlow*, 678 F.3d 552, 555-56 (7th Cir. 2012) (internal quotations omitted).  Accordingly, Chief Grimm in his individual capacity is entitled to summary judgment on Plaintiff's substantive due process claim.

The remaining individual Defendants are sued not for any affirmative action they took, but rather for what they failed to do in responding to the welfare check, to wit, refusing the JPD dispatcher's offer to send medical assistance, failing to enter the residence, and leaving the scene without having determined the source of the moaning sound.  Both parties agree that Defendants' alleged failure to act means that Plaintiff's substantive due process claim must be analyzed pursuant to the "state-created danger" doctrine set forth by the United States Supreme Court in *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189 (1989).  To establish a substantive due process claim under a state-created danger theory, Plaintiff must establish that: (1) the officers, by their affirmative acts, created or increased a danger that Becky Evans faced; (2) the officers' failure to protect her from danger was the proximate cause of her injuries; and (3) the district's failure to protect her "shocks the conscience." *Jackson v. Indian Prairie Sch. Dist. 204*, 653 F.3d 647, 654 (7th Cir. 2011) (citing *King ex rel. King v. East St. Louis Sch. Dist. 189*, 496 F.3d 812, 817-18 (7th Cir. 2007)).

Upon considered review of the facts before us here, we need address only the third element – whether Defendants' actions "shock the conscience" – the resolution of that

14

issue is outcome determinative in this situation.[5]  Conduct by state officials that shocks the conscience is conduct which may be deemed "arbitrary in the constitutional sense." *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998) (citation omitted).  Although courts recognize that this standard lacks precise measurement, "only conduct falling towards the more culpable end of the tort law spectrum of liability will be found to shock the conscience." *Jackson*, 653 F.3d at 655 (citations omitted).  Thus, "[m]aking a bad decision, or even acting negligently, does not suffice to establish the type of conscience-shocking behavior that results in a constitutional violation." *Id.* at 654-55.  In situations such as the one before us here, where "the circumstances permit public officials the opportunity for reasoned deliberation in their decisions, we shall find the official's conduct conscience shocking when it evinces a deliberate indifference to the rights of the individual." *King*, 496 F.3d at 819.  The inquiry into whether official conduct shocks the conscience is necessarily fact-based. *Id.* at 818.

Here, Defendants' conduct clearly did not rise to a level that shocks the conscience.  Officers Makowsky and Schiller were called to Teakwood Landing Drive to perform a welfare check.  Although a typical welfare check takes approximately ten to fifteen minutes, Officers Makowsky and Schiller spent more than an hour at the Evanses'

---

[5] Although we need not conduct a complete analysis of the first two prongs of the state-created danger test, we note that there is insufficient evidence to satisfy either in this case.  There is absolutely no evidence in the record regarding the circumstances of Becky Evans's death, the time of death, or its cause.  Accordingly, there is no evidence to support Plaintiff's assertion that Defendants' failure to enter the residence increased the danger to Ms. Evans or that their failure was the proximate cause of her death in the sense that had they entered the residence and found her, her death would have been prevented.

residence.  They listened to the moaning sound from Ms. Albi's bedroom and when they could not identify the source of the noise, they attempted to amplify the sound.  When they still could not determine the source of the noise, they repeatedly knocked on the Evanses' front door, rang the doorbell, and announced their presence.  After they failed to receive a response, Officer Schiller went to the back of the house to try to determine whether the occupants were home and saw evidence of a dog, although no dog had barked when the officers knocked on the door and rang the doorbell.  The officers also checked the mailbox, which contained a few days' worth of mail.  The officers ran driver's license record searches and criminal record searches and also attempted to check social media accounts.  Finally, Officer Makowsky again knocked at the front door and rang the doorbell while Officer Schiller listened at Ms. Albi's bedroom window to see whether the moaning sound had changed at all or if there were other signs of distress, such as a call for help, in response to the knocking and ringing of the doorbell, but the faint sound remained unchanged.

Upon Corporal Wilson's arrival on the scene, Officers Makowsky and Schiller relayed to him the steps they had taken to try to determine the source of the noise inside the house.  In response to Corporal Wilson's inquiry regarding whether circumstances justified a warrantless entry into the Evanses' residence, the officers stated that they did not believe so given that their investigation pointed toward no one being home, including the fact that there was evidence of a dog but no dog had barked in response to their knocking and ringing of the doorbell, that a few days of mail had accumulated in the

mailbox, and that they had not been able to determine that the noise was even coming from a human as opposed to some other source.  Apparently in agreement with this assessment, Corporal Wilson left the scene.  Before Officers Makowsky and Schiller departed, they instructed Ms. Albi to telephone the police again if the sound changed at all.

It is clear that these facts do not exhibit deliberate indifference.  To the contrary, Defendants used all resources available to them in an attempt to determine whether they had a legally justifiable reason to enter into the Evanses' residence.  Based on the totality of the circumstances they determined that they did not.  Although Plaintiff contends that the officers ultimately made the wrong decision, the law is clear that a bad decision, negligence, or even gross negligence is insufficient to support a substantive due process claim.  *McDowell v. Village of Lansing*, 763 F.3d 762, 766 (7th Cir. 2014) (citations omitted); *Jackson*, 653 F.3d at 654-55.

Plaintiff maintains that Defendants' failure to enter the home, when considered in light of the JPD's SOP and past history of entering homes during welfare checks, supports an inference that Defendants' conduct shocked the conscience.  We do not agree.  Plaintiff's reliance on the JPD's SOPs' statement that the fundamental goal of the police department is the "protection of life and property consistent with the values of a free society" and that "[s]aving lives and aiding the injured … are basic services provided by the Department" and that "the Department responds to calls for service and renders such aid or advice as is necessitated or indicated by the situation" does not carry the day.

Exh. 6.  Defendants' actions did not violate these procedures.  Specifically, the "values of a free society" include the constitutional warrant requirement for police entry into a home absent exigent circumstances.  Similarly, the SOPs specifically state that officers are to render aid only as is necessitated or indicated by the situation.  After a thorough investigation, Defendants determined that they were not lawfully justified in entering the Evanses' residence because they were unable to conclude that aid was in fact needed inside.  Accordingly, far from being in violation of the JPD's SOPs, we hold that the factors Defendants considered in deciding not to enter the home were fully in line with the Department's stated goals and procedures.

Plaintiff also argues that Defendants' inaction in this case is conscience-shocking when compared to the JPD's prior history of entering homes without warrants when conducting welfare checks.  We note that Defendants maintain in defense only that the officers did not exhibit deliberate indifference in making the determination that they could not lawfully enter the Evanses' residence on those grounds here.  In any event, a review of the records provided by the JPD of prior welfare checks performed by its officers shows that in determining whether exigent circumstances existed to justify a warrantless entry into a residence turned entirely on the particular facts and circumstances of each case.  The JPD records Plaintiff cites in support of the argument that the JPD has a practice of entering homes when conducting welfare checks are easily distinguishable from the facts in this case.  For example, in one prior case, the officers entered a residence after being informed that coughing and choking noises had been

heard; in another case, when the officers arrived to conduct the welfare check, they discovered a broken window that indicated forced entry; and in several cases the dispatch was for a suicidal subject, giving the officers specific knowledge that the individuals were at risk of causing self-harm.  *See* Dkt. 91-1.  In short, this history does not establish a pattern of warrantless entry by JPD officers in circumstances similar to those presented here.  Regardless, the mere fact that JPD officers on other occasions entered residences without warrants does not show that Defendants' failure to do so in this instance shocks the conscience in a manner required to support a substantive due process claim.

For these reasons, while Becky Evans's death appears to have occurred in a sad and tragic way, the individual Defendants did not contribute to that in a way that violated her constitutional rights.  They are, therefore, entitled to summary judgment on Plaintiff's substantive due process claim brought pursuant to § 1983.  Further, because we find that the individual officers did not deprive Ms. Evans of her constitutional rights, Plaintiff's claims against the City and Defendant Grimm in his official capacity likewise cannot survive summary judgment.  It is well-established that "a plaintiff must prove that the individual officers are liable on the underlying substantive claim in order to recover damages from a municipality under either a failure to train or failure to implement theory."  *Windle v. City of Marion, Ind.*, 321 F.3d 658, 663 (7th Cir. 2003).  Accordingly, we GRANT Defendants' Motion for Summary Judgment as to all of Plaintiff's § 1983 claims.

### III.    State Wrongful Death Claim[6]

Plaintiff has also brought a claim against the City of Jeffersonville under the Indiana Wrongful Death Act, Indiana Code § 34-23-1 *et seq.*, alleging that the negligent actions of the City's police officers caused the death of Becky Evans.  The City rejoins that it is entitled to immunity on this claim under both the Indiana Tort Claims Act ("ITCA") and Indiana common law.  "In general, it is only after a determination is made that a governmental defendant is not immune under the ITCA that a court undertakes the analysis of whether a common law duty exists under the circumstances."  *Veolia Water Indianapolis, LLC v. National Trust Ins. Co.*, 3 N.E.3d 1, 5 (Ind. 2014) (quoting *Benton v. City of Oakland City*, 721 N.E.2d 224, 232 (Ind. 1999)).  Accordingly, we turn first to the question of whether the City is entitled to statutory immunity.

### A.    ITCA Immunity

The ITCA governs governmental immunity from suit.  *See* IND. CODE § 34-13-3-3.  Because the ITCA is in derogation of the common law, it is construed narrowly against the grant of immunity.  *Mangold ex rel. Mangold v. Indiana Dep't of Nat. Res.*, 756 N.E.2d 970, 975 (Ind. 2001).  As the party seeking immunity, the City bears the burden of establishing that its conduct comes within the Act.  *King v. Northeast Security, Inc.*, 790 N.E.2d 474, 480 (Ind. 2003), *reh'g denied*.

---

[6] Plaintiff concedes that summary judgment is appropriate on this claim as brought against Defendants Grimm, Makowsky, Schiller, and Wilson in their individual capacities.  Accordingly, Defendants' Motion for Summary Judgment is <u>GRANTED</u> on Plaintiff's state wrongful death claim brought against the individual Defendants.

The City contends that it is immune from liability on Plaintiff's wrongful death claim under Indiana Code § 34-13-3-3(8), which provides immunity for the "adoption and enforcement of or failure to adopt or enforce … a law (including rules and regulations) … unless the act of enforcement constitutes false arrest or false imprisonment."  The City argues that the JPD officers were enforcing (or failing to enforce, in Plaintiff's perspective) the Fourth Amendment when they determined that exigent circumstances did not exist to justify their warrantless entry into the Evanses' residence and thus the City is entitled to immunity under Section 3(8).  Plaintiff rejoins that the actions for which the JPD officers are being sued do not meet the definition of "enforcement" under the ITCA and therefore the City is not entitled to immunity under this provision.

Under Indiana law, the scope of "enforcement" as used in Section 3(8) "means compelling or attempting to compel the obedience of *another* to laws, rules, or regulations, and the sanctioning or attempt to sanction a violation thereof."  *St. Joseph County Police Dep't v. Shumaker*, 812 N.E.2d 1143, 1150 (Ind. Ct. App. 2004) (emphasis in original).  It also "by the plain meaning of the statute, include[s] the failure to do such."  *Id.*  It does not, however, "include compliance with or following of laws, rules, or regulations by a governmental unit or its employees.  Neither does it include failure to comply with such laws, rules, or regulations."  *Id.*

Here, the JPD officers are being sued for the manner in which they performed the welfare check, namely, that they were negligent in failing to enter the home and call for

medical assistance and that they failed to appropriately exercise their lawful authority to take steps necessary to render emergency aid.  The officers at no time compelled or attempted to compel any other individual to comply with laws, rules, or regulations nor did they sanction or attempt to sanction any individual for a violation of such.  The City contends that the officers are being sued for having "enforced" the Fourth Amendment, but abiding by the Constitution is not equivalent to compelling obedience with the law.  Because the JPD officers were not engaged in the enforcement of a law as contemplated by the ITCA, the City is not entitled to immunity under Section 3(8).

The City also claims that it is immune under Indiana Code § 34-13-3-3(19), which provides immunity for the "[d]evelopment, adoption, implementation, operation, maintenance, or use of an enhanced emergency communication system."  The City's argument is premised on the fact that the welfare check to which the JPD officers responded originated with the telephone call made by Ms. Albi to the 911 system.  However, the cases cited by the City in support of this contention are easily distinguishable from the circumstances before us because, unlike the case at bar, in the cases the City cites, a failure specifically connected to the enhanced emergency communication system in some way led to the injuries of which the plaintiffs complained.

For example, in *Giles v. Brown County*, 868 N.E.2d 478, 479 (Ind. 2007), the Indiana Supreme Court held that the defendant was entitled to immunity where the decedent had made a call to the Brown County 911 operator, who requested an

ambulance from Columbus Regional Hospital, which was located in the adjoining county. Because Columbus Regional did not have an available ambulance when the call was received, it requested an ambulance from Bloomington Hospital, located in another county adjoining Brown County. The ambulance did not arrive for more than one hour and the decedent died shortly after. *Id.* at 479-80. In *Burns v. City of Terre Haute, Ind.*, 744 N.E.2d 1038 (Ind. Ct. App. 2001), the Court of Appeals held that the city was immune from liability where a 911 dispatcher provided directions from memory rather than using the map contained in the computer system. Because the directions given by the dispatcher as opposed to the computer were less precise, the ambulance took nine to ten minutes to arrive, whereas the computer route would have allowed to trip to occur in only one minute. *Id.* at 1040. Finally, in *Barnes v. Antich*, 700 N.E.2d 262 (Ind. Ct. App. 1998), the governmental defendant was found immune from a claim based on the 911 dispatchers' failure to dispatch an ambulance despite their repeated reports to the plaintiff that an ambulance was on the way. *Id.* at 265-66.

The facts here are inapposite. Plaintiff's claim is in no way related to the manner in which the 911 call was received, how it was handled by the 911 dispatcher or the manner in which the officers were dispatched to conduct the welfare check. There is no dispute that the officers were given the correct address, followed the correct route, and arrived at Teakwood Landing in a timely manner. Rather, Plaintiff's claims are all based on the actions (or inaction) of the officers after they arrived on the scene. We simply

cannot find that the mere fact that the welfare check was initiated by a 911 call is sufficient to confer immunity under Section 3(19).

## B.      Common Law Immunity

Having determined that the City is not entitled to statutory immunity under the ITCA, we turn to address whether it is entitled to common law sovereign immunity on Plaintiff's wrongful death claim.  In a series of decisions culminating with the ruling in *Campbell v. State*, 284 N.E.2d 733 (1972), the Indiana Supreme Court abrogated the common law immunity from tort liability afforded to governmental units "in *almost* all respects."  *Benton v. City of Oakland City*, 721 N.E.2d 224, 227 (Ind. 1999) (emphasis in original).  However, the *Benton* Court recognized that *Campbell* identified the following three situations in which governmental units are immunized from tort liability: "(1) where a city or state fails to provide adequate police protection to prevent crime; (2) where a state official makes an appointment of an individual whose incompetent performance gives rise to a suit alleging negligence on the part of the state official for making such an appointment; and (3) where judicial decision-making is challenged."  721 N.E.2d at 227 (internal citations omitted).  Thus, following *Campbell*, courts are to "presum[e] that a governmental unit is bound by the same duty of care as a non-governmental unit except where the duty alleged to have been breached is so closely akin to one of the limited exceptions (prevent crime, appoint competent officials, or make correct judicial decisions) that it should be treated as one as well."  721 N.E.2d at 230.

Since *Benton*, the Indiana Supreme Court has identified various exceptions, including the "failure to provide adequate rescue services necessary to aid those in emergency situations." *City of Hammond v. Cipich ex rel. Skowronek*, 788 N.E.2d 1273, 1283 (Ind. Ct. App. 2003). In *Cipich*, the court held that the police and firefighters who responded to the scene where a motorist had intentionally driven his vehicle into Lake Michigan were immunized for their allegedly negligent actions and decisionmaking in attempting to rescue the motorist. Similarly, here, the JPD officers, who are being sued for their allegedly negligent failure to provide adequate rescue services to Becky Evans, we find consistent with the decision in *Cipich*, that the provision of emergency rescue services is so closely akin to the duty to prevent crime that it falls within that limited exception to governmental liability. *See Fair v. State*, 627 N.E.2d 427, 431 (Ind. 1993) (recognizing that "police are expected not only to enforce the criminal laws but also to aid those in distress, abate hazards, prevent potential hazards from materializing, and perform an infinite variety of other tasks calculated to enhance and maintain the safety of communities"). Accordingly, the City is entitled to the protections of common law immunity on Plaintiff's wrongful death claim based on the JPD officers' actions on June 10, 2012.[7]

---

[7] Although the City argued only that it was entitled to immunity from Plaintiff's wrongful death claim and did not proceed to address the merits of that claim on summary judgment, we note that without additional evidence, including at the very least evidence regarding the official time and cause of death, Plaintiff would be unable to establish proximate cause as required to prove a wrongful death claim.

**IV.     Conclusion**

For the reasons detailed above, Defendants' Motion for Summary Judgment is

<u>GRANTED</u> in its entirety.  Final judgment shall issue accordingly.

IT IS SO ORDERED.


Date:    _____3/8/2016_____                     _____

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

R. Jeffrey Lowe
KIGHTLINGER & GRAY, LLP-New Albany
jlowe@k-glaw.com

W. Trent Van Haaften
VAN HAAFTEN & FARRAR
trent@vhflawyers.com